Filed 9/14/21  In re J.J. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re J.J., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> J.J., <br><br> Defendant and Appellant. | F081967 <br><br> (Super. Ct. No. JJD072977) <br><br><br> **OPINION** |

## THE COURT[*]

APPEAL from an order of the Superior Court of Tulare County.  Hugo J. Loza, Judge.

Candice L. Christensen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Kari Ricci Mueller, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Detjen, Acting P.J., Franson, J. and Snauffer, J.

Minor, J.J., appeals from a disposition order continuing him a ward of the juvenile court, granting him probation, and committing him to the mid-term program for 365 days. On appeal, he argues that (1) his inculpatory statements should have been suppressed pursuant to *Miranda*,[1] (2) the true finding for burglary should be dismissed because it is a lesser included offense to the true finding on assault with intent to commit rape, (3) insufficient evidence supported the true finding for assault with intent to commit rape, and (4) the juvenile court failed to award appropriate custody credits. The People disagree on the first three accounts but concede that the matter must be remanded for specification of the maximum term of confinement and calculation of custody credits. We remand for specification of the maximum term of confinement and calculation of custody credits. In all other respects, we affirm.

## PROCEDURAL SUMMARY

On June 3, 2020,[2] the Tulare County District Attorney filed an amended juvenile wardship petition (Welf. & Inst. Code, § 602, subd. (a)), alleging minor made criminal threats (Penal Code, § 422;[3] count 1).

On June 4, minor admitted the truth of the petition.

On June 17, the juvenile court granted minor a deferred entry of judgment.

On June 23, the Tulare County District Attorney filed a second juvenile wardship petition (Welf. & Inst. Code, § 602, subd. (a)) (second petition) alleging minor made criminal threats (§ 422; count 1); committed misdemeanor vandalism (§ 594, subd. (a); count 2); and committed assault with a deadly weapon (§ 245, subd. (a)(1); count 3).

On July 13, count 3 was reduced to misdemeanor brandishing (§ 417; count 3) and minor admitted all three counts.

---

[1]    *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

[2]    All further dates refer to the year 2020 unless otherwise stated.

[3]    All further statutory references are to the Penal Code unless otherwise stated.

2.

On September 9, the juvenile court declared minor a ward of the court and placed him on probation.

On October 13, the Tulare County District Attorney filed an amended third juvenile wardship petition (Welf. & Inst. Code, § 602, subd. (a)) (third petition) alleging minor committed first degree burglary (§ 459; count 1); assault with intent to commit rape (§ 220, subd. (a)(1); count 2); false imprisonment by violence (§ 236; count 3); and misdemeanor battery (§ 242; count 4).

On October 15, minor admitted the truth of count 4 and denied counts 1, 2, and 3. On October 19, the juvenile court held a contested jurisdictional hearing and found counts 1, 2, and 3 to be true.

On October 21, minor filed a notice of appeal.[4]

On November 2, the juvenile court continued minor as a ward of the court, placed him on probation, and committed him to the mid-term program for 365 days.

### FACTUAL SUMMARY[5]

### E.J.

On September 26, between 2:00 p.m. and 3:00 p.m., E.J. and her roommate, A.L., left her apartment to go to a park. They soon returned because they had forgotten a bottle of alcohol in the apartment that they had intended to bring with them. E.J. double parked and began walking back to her apartment. She saw minor at a distance and thought he might be her cousin. Minor was wearing black and white or black and yellow windbreaker pants and no shirt. He appeared to be sweaty. As he got closer, she realized that he was not her cousin, but someone she lived near at a previous apartment complex that she knew by the name of " 'Bad Ass.' " Minor walked to the front door of E.J.'s

---

**4** Though the notice of appeal was filed prematurely, the disposition order issued soon after and we treat the notice of appeal "as filed immediately after the rendition of judgment or the making of the order." (Cal. Rules of Court, rule 8.406(d).)

**5** Minor's contentions on appeal relate only to the allegations of the third petition. We therefore summarize only the facts underlying that petition.

apartment and gave her a hug. She noticed that his face was pale and "[h]e looked like he was on something." E.J. told minor that she was about to leave. She went inside her apartment to retrieve her bottle of alcohol, leaving the door slightly ajar, and assumed minor had walked away. She opened her freezer to retrieve the bottle and several other items fell out. She returned the other items, closed the freezer, and noticed that minor was inside her apartment.

E.J. said, " 'Whoa, what are you doing?' " Minor immediately grabbed her by the throat. She told him to " 'chill' " and asked if he was on something. E.J. then asked minor what he was doing in her apartment and told him that she did not invite him in. In response, minor attempted to grope her. E.J. asked minor what he was doing. He said, " 'You know what I'm here for.' " E.J. said, " 'What are you doing? What are you talking about? Why are you at my house?' " Minor, with one hand still on E.J.'s throat, then attempted to pull her shorts down in the kitchen. She told him that he needed to stop. Minor said, " 'Look here … [y]ou feel this bone in your neck? If I push it, I can kill you. So you're going to give me what I came for.' " E.J. and minor then began to "tussle"; she attempted to force minor off of her and he continued to choke her. The fingernails on one of E.J.'s hands were broken off in the struggle. She told minor, " 'I can't breathe. You need to stop.' "

Minor then pushed E.J. until her back hit the back of the couch in the living room and she fell. Minor said, " 'B**ch, I'll beat your a**. Stay down. Don't get up. Don't move.' " Although the apartment was empty, E.J. told minor that her cousin was in the back of the apartment to try to scare him away. Minor responded that he did not care. E.J. stood and minor grabbed her from behind and began choking her again and attempted to put his hand under her shorts. Minor told E.J. that he was " 'going to put [her] on [his] lap, and do what [he] ha[d] to do to get what [he] want[ed].' " E.J. told minor that " '[t]his [was] not going to end well … [she had] a friend[, A.L.,] sitting in the

4.

car. [A.L. was] going to worry about [E.J.] When she [came] in and [saw minor], she [was] going to call the police.' " Minor was not deterred.

E.J. then told minor she needed to tell A.L. that she needed to use the restroom so she did not get suspicious about the delay. Minor grabbed E.J.'s face and said, " 'B**ch, you're not going anywhere without giving me a kiss. If you don't give me a kiss, you're not leaving this house.' " E.J. kissed minor and he walked her to the front door. E.J. estimated that from the time she entered her apartment to the time she left her apartment, 30 minutes had passed. E.J. walked to the car, entered the car, and locked the door. E.J. told A.L. what happened and told her to call E.J.'s male cousin. E.J. started the car and began to drive away. Minor chased after her car for less than 50 or 100 yards. E.J.'s car almost collided with oncoming traffic as she fled.

E.J. drove to her cousin's house and told him what happened. E.J.'s cousin called minor's family member and told the family member to meet them. E.J. told her cousin that she had left her apartment unlocked and open when she fled. E.J., A.L., and E.J.'s cousin then went back to her apartment. Her cousin went into the apartment, but minor was gone. A neighbor told E.J.'s cousin that minor was walking down the street. E.J. saw the apartment manager and told her that minor had tried to rape her. The apartment manager told E.J. that she had already called the police because minor had also approached the apartment manager's home.

On cross-examination, E.J. admitted that she had previously been convicted of two felonies and had twice before reported having been the victim of domestic abuse.

On September 26, E.J. posted a social media post that read, " 'When a woman says no, it means no.' " Several days later, E.J. posted a second social media post, mentioning that she needed to find a new place to live. She acknowledged that the post was made because she no longer felt safe in her home because minor "violated [her] in [her] home." Several days later, she posted a third social media post that read " 'I pray that [g]od forgives me for the things I said. I just hope he understands I was going

through it.  I was hurt and scared and mentally and emotionally.  Physically, I was messed up, but coming to you asking you please help me get past this.  Help me get past this depression stage, lord.  I know I took 100 steps backward.  I'm weak right now.  I'm not there, lord.  I'm asking for help to bring back this beautiful field with nothing but positive, happy, and free spirit, always smiling and positive like the girl in these pictures because I give up.  I lost it and need help.  Please cover me.' "  E.J. explained that the post was in response to a previous post where she blamed god for her situation.  She testified the third post was unrelated to minor.

E.J. did not have any bruising on her neck from minor's attack and her clothes were not dirty or torn.  E.J.'s first response was not to call the police.  She called her cousin because she wanted "to have harm done to [minor]."

**A.L.**

On September 26, A.L. and E.J. planned to go to a park for a picnic.  They left their apartment, then returned to retrieve a bottle of alcohol.  E.J. parked the car about 20 feet from the apartment.  A.L. planned to wait in the car while E.J. went inside to retrieve the bottle of alcohol.  She saw E.J. walk to the apartment and minor walk toward E.J. and give her a hug.  A.L. assumed E.J. knew minor because E.J. said that he might be her cousin.  A.L. saw E.J. enter the apartment but did not see minor enter the apartment.  Approximately 30 to 35 minutes later, E.J. exited the apartment and looked scared.  As soon as E.J. got in the car, she told A.L. to call E.J.'s cousin and told A.L. what happened in the apartment.  E.J. drove away from her apartment but not out of the apartment complex.  A.L. then "looked back" and saw minor "running toward[] the car."  E.J. then drove out of the complex and into traffic.

E.J. drove to her cousin's house.  A.L. and E.J. picked up E.J.'s cousin and returned to E.J.'s apartment.  Minor was not in the apartment.  The apartment manager had called the police and they arrived shortly after.

**Officers Lara and Robertson**

On September 26, at about 5:00 p.m., City of Tulare Police Officers Allen Lara and J.T. Robertson were dispatched to E.J.'s apartment complex regarding a call that about 15 people might engage in a physical altercation with minor. Robertson had seen minor about 45 minutes before the call, roughly one and one-quarter miles from the apartment complex. Robertson knew minor because he had been the school resource officer for two years at the school that minor previously attended. When Robertson arrived, minor approached him and told Robertson to take him into custody. Minor told Robertson that he was scared, and that people were going to try to attack him. Robertson asked minor if he wanted to sit in the back of Robertson's patrol car and minor agreed. Robertson described minor as behaving erratically—he was scared at points; he had normal conversation; he made screaming statements; he sat in a "stoic state where he would just … stare."

When Lara arrived, he saw minor talking to Robertson. Lara spoke to E.J. and A.L. He did not notice that E.J. had suffered any visible injury. Lara then observed minor. He was "pretty erratic. [He] [w]as quiet, then would have bursts of anger and would shout stuff." Lara read minor a *Miranda* admonition and attempted to take a statement from minor, but stopped quickly because minor was yelling at people outside of the patrol car.

Lara did not observe any marks on E.J., but he noted that her complexion was dark and it was difficult to tell if she had any bruising. E.J.'s clothing did not appear to be torn.

Robertson drove minor to the Tulare Police Department. During the drive, during a lull in the conversation, "[minor] was kicking the door, [and] grabbing on to the back portion of the seat." Robertson, "in order to make [minor] a little more relaxed, … [engaged in] idle conversation [with minor about] school [and] sports, that sort of thing." "At one point, [minor] got as close as he could to the [metal] screen" separating the front

7.

and back seats and said, " 'Hey, you know that girl I choked?' "  Robertson was unsure if he heard minor correctly, so he responded, " 'What?' "  Minor repeated, " 'You know that girl I choked?' "  Robertson responded that he did not know her.

**D.M.**

D.M. is minor's mother.  On September 26, she and minor came from Visalia to Tulare for a barbecue.  They arrived in Tulare at approximately 4:00 p.m.  She noticed that minor was gone at about 4:10 p.m.  At 4:20 p.m., she received a call informing her that minor was at her daughter's apartment complex.[6]

## DISCUSSION

### 1. *Miranda*

Minor contends that his inculpatory statement to Robertson about " 'that girl [he] choked' " should have been suppressed pursuant to *Miranda*.  The People disagree, as do we.

"In reviewing the [juvenile] court's ruling on a claimed *Miranda* violation, ' "we accept the [juvenile] court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence.  We independently determine from [those facts] whether the challenged statement was illegally obtained." ' " (*People v. Elizalde* (2015) 61 Cal.4th 523, 530.)  Further, "[w]e apply federal standards in reviewing defendant's claim that the challenged statements were elicited from him in violation of *Miranda*."  (*People v. Bradford* (1997) 14 Cal.4th 1005, 1033.)

The rule of *Miranda* requires that before police may question a suspect during a custodial interrogation, the suspect must be advised of the right to remain silent and to an attorney and that any statements may be used against him or her in court.  (*Miranda*, *supra*, 384 U.S. at p. 479; *Rhode Island v. Innis* (1980) 446 U.S. 291, 297.)  "[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either

---

[6]    D.M.'s daughter's apartment complex was a different complex than E.J.'s apartment complex.

express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Innis*, *supra*, 446 U.S. at pp. 300–302.) *Miranda* does not apply if the suspect is not being interrogated. (*Miranda*, *supra*, 384 U.S. at p. 478 ["Volunteered statements of any kind are not barred by the Fifth Amendment."].) Further, " 'neutral inquir[ies]' made for 'the purpose of clarifying [statements] or points that [the questioner] did not understand' " do not trigger *Miranda*. (*People v. Ray* (1996) 13 Cal.4th 313, 338.)

Here, minor was not subject to an interrogation when he made the inculpatory statements to Robertson. Robertson testified that he was making "idle conversation" with minor about "school [and] sports" because, when the conversation lulled, minor kicked the door and grabbed onto the seat. Asking minor questions about school and sports was not reasonably likely to elicit an incriminating response. Robertson did ask minor a question in response to minor's unprompted statement about " 'that girl [he] choked .…' " However, Robertson's question—" 'What?' "—was a neutral clarifying question that did not trigger *Miranda*. (*People v. Ray*, *supra*, 13 Cal.4th at p. 338.) The juvenile court did not err in admitting the statements based on the conclusion that no *Miranda* violation occurred.

**2. First Degree Burglary is Not a Necessarily Included Offense of Assault with Intent to Commit Rape**

The third petition alleged first degree burglary (§ 459) in count 1 and assault with intent to commit rape (§ 220, subd. (a)(1)) in count 2.[7] The juvenile court found both

---

[7] The petition did not allege assault with intent to commit rape in the commission of a burglary of the first degree (§ 220, subd. (b)). Minor was not and could not have been found to have committed assault with intent to commit rape during a residential burglary. (*In re Maxwell C.* (1984) 159 Cal.App.3d 263, 266 ["A minor cannot be found to have committed an offense neither specifically alleged nor necessarily included in the alleged offense without his consent."].)

allegations true. Minor contends the true finding on count 1 should be dismissed because it was a lesser include offense of count 2. The People disagree, as do we.

Generally, "a [minor] may be [found to have committed], although not *punished* for, more than one crime arising out of the same act or course of conduct." (*People v. Reed* (2006) 38 Cal.4th 1224, 1226 (*Reed*); *People v. Gonzalez* (2014) 60 Cal.4th 533, 537 ["We have repeatedly held that the same act can support multiple charges and multiple convictions."].) There is, however, an exception to this general rule: a minor cannot be found to have committed two offenses when one is necessarily included in the other. (See *Reed*, at p. 1227 ["A judicially created exception to the general rule permitting multiple conviction 'prohibits multiple convictions based on necessarily included offenses.' "]; *People v. Ortega* (1998) 19 Cal.4th 686, 693 ["a defendant properly may be convicted of two offenses if neither offense is necessarily included in the other"], overruled on other grounds by *Reed*, at p. 1228.) This exception ensures that a minor is not twice found to have committed the necessarily included, lesser offense. (*People v. Medina* (2007) 41 Cal.4th 685, 702.)

When two offenses are alleged, and the minor is found to have committed both, we apply the "elements" test to assess whether one is a necessarily included offense of the other and, in turn, whether multiple true findings are proper. (*Reed*, *supra*, 38 Cal.4th at p. 1229; *People v. Scheidt* (1991) 231 Cal.App.3d 162, 165–171 ["only a statutorily lesser included offense is subject to the bar against multiple convictions in the same proceeding"].) "Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former." (*Reed*, *supra*, 38 Cal.4th at p. 1227.) In other words, "if the crimes are defined in such a way as to make it impossible to commit the greater offense without also committing the lesser," then the lesser is necessarily included in the greater and a true finding on the lesser offense must be vacated. (*People v. Miranda* (1994) 21 Cal.App.4th 1464, 1467; accord, *Reed*, at p. 1227.)

Minor cites *People v. Dyser* (2012) 202 Cal.App.4th 1015, 1021 (*Dyser*), for the proposition that "first degree burglary is a lesser included offense of assault with intent to commit rape." *Dyser* does not stand for that proposition.[8]  In *Dyser*, the defendant was convicted of first degree burglary (§ 459), assault with intent to commit rape (§ 220, subd. (a)(1)), *and* assault with intent to commit rape during a residential burglary (§ 220, subd. (b)), among other offenses.  (*Dyser*, at p. 1019.)  The issue before the court was not whether first degree burglary was a lesser included offense of assault with intent to commit rape; the issue was whether first degree burglary and assault with intent to commit rape were both lesser included offenses of assault with intent to commit rape during a residential burglary.  (*Id*. at pp. 1020–1021.)  The *Dyser* court answered that question in the affirmative—pursuant to the elements test, first degree burglary and assault with intent to commit rape are both lesser included offenses of assault with intent to commit rape during a residential burglary because commission of assault with intent to commit rape during a residential burglary cannot be committed without committing both other offenses.  (*Ibid*.)  The same is not true here.

The statutory definition of first degree burglary is as follows:  "Every person who enters any house … with intent to commit … any felony is guilty of burglary."  (§ 459; see *People v. Montoya* (1994) 7 Cal.4th 1027, 1041.)  "Every burglary of an inhabited dwelling house … is burglary of the first degree."  (§ 460.)

The statutory definition of assault with intent to commit rape is as follows:  "[A]ny person who assaults another with intent to commit mayhem, rape, sodomy, oral copulation, or any violation of Section 264.1, 288, or 289 shall be punished by imprisonment in the state prison for two, four, or six years."  (§ 220, subd. (a)(1).)[9]

---

[8]    In fact, appellate counsel's repeated statements regarding the holding of *Dyser* come dangerously close to violating her duty to not mislead the court by false statements of law.  (Bus. & Prof. Code, § 6068, subd. (d).)

[9]    CALCRIM No. 890, as modified, more completely sets out the elements of the offense:  "To prove that the defendant is guilty of [assault with the intent to commit rape or other acts of sexual assault] the People must prove that:  [¶]  1. The defendant did an

11.

Assault with intent to commit rape can be committed without necessarily also committing first degree burglary. First degree burglary is not a lesser included offense of assault with intent to commit rape. The trial court did not err in finding both offenses true.

### 3. **Sufficient Evidence Supported the First Degree Burglary Finding**

Third, minor contends insufficient evidence supported the finding that he committed first degree burglary because his intent to commit a felony at the time he entered E.J.'s apartment cannot be inferred from the record. Again, the People disagree, as do we.

> " 'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the [disposition order] to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find [the allegation true] beyond a reasonable doubt." [Citations.] We presume in support of the [disposition order] the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] … We do not reweigh evidence or reevaluate a witness's credibility.' [Citations.] 'Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a [disposition order].' " (*People v. Brown* (2014) 59 Cal.4th 86, 105−106; see *In re M.V.* (2014) 225 Cal.App.4th 1495, 1518 ["The standard of review in juvenile proceedings involving criminal behavior is the same as that required in adult criminal trials .…"].)

"The standard of review is the same in cases in which the People rely … on circumstantial evidence." (*People v. Stanley* (1995) 10 Cal.4th 764, 792.) Circumstantial

---

act that by its nature would directly and probably result in the application of force to a person; [¶] 2. The defendant did that act willfully; [¶] 3. When the defendant acted, [he] was aware of facts that would lead a reasonable person to realize that [his] act by its nature would directly and probably result in the application of force to someone; [¶] 4. When the defendant acted, [he] had the present ability to apply force to a person; [¶] [and] 5. When the defendant acted, [he] intended to commit [the crimes of rape or other acts of sexual assault]."

12.

evidence may be sufficient on its own to prove the truth of a crime beyond a reasonable doubt. (*Id*. at p. 793.)

The purportedly insufficiently proven element in this case was minor's intent to commit a felony when he entered E.J.'s apartment. "Intent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense." (*People v. Pre* (2004) 117 Cal.App.4th 413, 420.) "Evidence of a [minor's] state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a [true finding]." (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208.) Such circumstantial evidence includes the defendant's conduct before, during, and after entry into the home. (*People v. Holt* (1997) 15 Cal.4th 619, 669–670.) When the evidence justifies a reasonable inference of felonious intent upon entry, the verdict may not be disturbed on appeal. (*Id*. at p. 670.)

Here, when minor was inside E.J.'s apartment, he took actions and made statements that shed light on his intent in entering her apartment. Before minor entered E.J.'s apartment, he gave her a hug. Once inside, minor grabbed E.J. by the throat, groped her, and attempted to pull down her shorts. He said, " 'You know what I'm here for.' " Soon after, he said, " 'Look here … [y]ou feel this bone in your neck? If I push it, I can kill you. So you're going to give me what I came for.' " He told E.J. he was " 'going to put [her] on [his] lap, and do what [he] ha[d] to do to get what [he] want[ed].' " And when E.J. attempted to leave, he told her, " 'B\*\*ch, you're not going anywhere without giving me a kiss. If you don't give me a kiss, you're not leaving this house.' " He then forced E.J. to give him a kiss before she was permitted to leave. Based on that record, the juvenile court could reasonably have inferred that minor intended to rape E.J. when he entered her apartment. For that reason, we do not disturb the juvenile court's finding.

**4. The Juvenile Court Should Have Awarded Minor Credit for the Time He Spent in Juvenile Hall**

The juvenile court awarded no credit for the 88 days minor spent in juvenile hall. Minor contends the juvenile court should have awarded him custody credit for that time. The People concede the issue and we accept the concession. The People further note that the juvenile court failed to specify minor a maximum period of confinement. Minor agrees, as do we.

A juvenile court must specify a maximum term of confinement when removing a minor from the custody of their parent. (*In re Edward B.* (2017) 10 Cal.App.5th 1228, 1238, citing Welf. & Inst. Code, § 726, subd. (d)(1).) A juvenile court must also calculate the number of custody credits earned. (*In re Edward B.*, at p. 1238, citing § 2900.5, subd. (d).) Because the juvenile court did neither in this case, we must remand for it to make the required determinations.

## DISPOSITION

The matter is remanded to the juvenile court to specify the maximum term of confinement and calculate the number of custody credits earned. In all other respects, the order is affirmed.